STATE OF MAINE

CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO: AP-05-090,
095, 096

RAC-CUM-2/10/06

MAINE ASSOC. of HEALTH PLANS,
MAINE AUTOMOBILE DEALERS,
and MAINE STATE CHAMBER OF COMMERCE,

Petitioners

v.

STATE OF MAINE, and
DIRIGO HEALTH AGENCY,

Respondents

**ORDER ON
80C APPEAL**

This case comes before the Court on Petitioners' 80C appeal of a decision of the Superintendent of Insurance that $43.7 million dollars of "aggregate measurable cost savings" determined by the Board of Directors of Dirigo Health Agency is reasonably supported by the record evidence pursuant to 24-A M.R.S.A. 6913.

## BACKGROUND

The Dirigo Health Act established the Dirigo Health Agency (the "Agency") as an independent executive agency of the State of Maine to arrange for the provision of comprehensive, affordable health care coverage to eligible small employers, including the self-employed, their employees and dependents. 24-A M.R.S.A. § 6902. The Health Reform Act established a Board of Directors (the "Board") to oversee the work of the Agency. 24-A M.R.S.A. § 6904.

An essential component of the Act is the provision of subsidies for the purchase of Dirigo Health Insurance coverage by low-income individuals and employees. 24-A M.R.S.A. § 6912.[1] These subsidies are funded by savings offset payments made by health insurance carriers, employee excess benefit insurance carriers, and 3rd party administrators. 24-A M.R.S.A. § 6913(2). The Act aims to benefit member carriers by increasing the number of Maine people covered by Dirigo Health Insurance, which in turn provides cost savings to member carriers. Member carriers are encouraged to recover further cost savings through negotiation of reimbursement rates with health care providers. 24-A M.R.S.A. § 6913(7).

In order to provide subsidies to the target population, the Board is charged with collecting savings offset payments from its member health insurance carriers. 24-A M.R.S.A. § 6913(3)(A). The first step in establishing the savings offset amount is the determination of "aggregate measurable cost savings" ("AMCS") pursuant to 24-A M.R.S.A. § 6913(1)(A). The Act requires the Board to determine the "aggregate measurable cost savings, including any reduction or avoidance of bad debt and charity care costs to health care providers in this state as a result of the operation of Dirigo Health and any increased MaineCare enrollment due to an expansion in MaineCare eligibility occurring after June 30, 2004." 24-A M.R.S.A. § 6913(1)(A).

---

[1]     24-A M.R.S.A. § 6912 provides:

Dirigo Health may establish sliding-scale subsidies for the purchase of Dirigo Health Program coverage paid by eligible individuals or employees whose income is under 300% of the federal poverty level. Dirigo Health may also establish sliding-scale subsidies for the purchase of employer-sponsored health coverage paid by employees of businesses with more than 50 employees, whose income is under 300% of the federal poverty level.

The procedure for determining AMCS in the first year of savings offset payments is as follows: The Superintendent of Insurance must convene a working group to advise the Board on a number of issues. P.L. 2005, ch. 400, § B-1. The working group includes 5 members representing the interests of insurers, self-insured entities and 3rd party administrators, and 5 members representing the Agency. The working group is commissioned to make a recommendation on the definition of paid claims and a recommendation on the methodology for calculating AMCS. The Board must then file with the Superintendent its calculation of AMCS no later than September 17, 2005. P.L. 2005, ch. 400, § B-2. The Superintendent must issue an order approving, in whole or in part, or disapproving the filing made by the Board with regard to AMCS. 24-A M.R.S.A. § 6913(1)(C). The filing is to be approved if the Superintendent determines that the AMCS filed by the Board are reasonably supported by the evidence in the record. P.L. 2005, ch. 400, § B-2(B); 24-A M.R.S.A. § 6913(1)(C).

The Act limits the savings offset amount in that it may not exceed the calculated AMCS, is limited to the amount of funds necessary to provide subsidies, and may not include general administrative expenses, except for general administrative expenses of the Maine Quality Forum. 24-A M.R.S.A. § 6913(2)(C),(D). The Act contains other limitations on the calculations of savings offset payments for each category of members.[2]

---

[2] 24-A M.R.S.A. § 6913(3)(B), (C) provides as follows:

B. Maximum savings offset payments are as follows:

(1) For health insurance carriers, the savings offset payment may not exceed 4.0% of annual paid claims for health care on policies issued pursuant to the laws of this State that insure residents of this State;

After many meetings with the working group to establish the methodology for calculating AMCS, the Board determined that AMCS comprise five categories of savings initiatives: hospital savings, uninsured savings, health care provider fee savings, certificate of need and capital investment fund savings, and insurance carrier savings.[3] The Board reported its finding to the Superintendent on September 19, 2005. The Superintendent then conducted a public hearing to determine whether the AMCS determined by the Board were reasonably supported by the evidence. 24-A M.R.S.A. § 6913(1)(C).

After hearing, the Superintendent approved the Dirigo filing in part. He disapproved completely the amounts calculated for the certificate of need and capital investment savings, and the insurance carrier savings. He ultimately reduced the AMCS calculated by the Board from $136.8 million to $43.7 million. This appeal followed.

## DISCUSSION

(2) For 3rd-party administrators, the savings offset payment may not exceed 4.0% of annual paid claims for health care for residents of this State; and

(3) For employee benefit excess insurance carriers, the savings offset payment may not exceed 4.0% of annual paid claims on employee benefit excess insurance policies, as defined in section 707, subsection 1, paragraph C-1, issued pursuant to the laws of this State that insure residents of this State.

C. A health insurance and employee benefit excess insurance carrier may not be required to pay a savings offset payment on policies or contracts insuring federal employees.

[3]    The Board determined that hospital savings initiatives encompass consolidated operating margins ("COM") and cost per case-mix adjusted discharge ("CMAD"); uninsured savings initiatives encompass the reduction of uninsured bad debt and charity care, and the woodwork effect; health care provider fee savings initiatives encompass hospital fee initiatives and physician fee initiatives; certificate of need and capital investment fund savings initiatives encompass certificate of need ("CON") moratorium and capital investment fund ("CIF"); and insurance carrier savings initiatives encompass voluntary underwriting gain ("VUG") limitation.

First, Petitioners argue that the Dirigo Health Act is unconstitutional in that it is void for vagueness and improperly delegates the taxing powers of the Legislature. Second, Petitioners argue that the methodology adopted by the Board to calculate AMCS is flawed and the record evidence does not reasonably support the Superintendent's decision.

## a.    The Constitutionality of the Dirigo Health Act

A strong presumption of constitutionality attaches to all statutes, which will be construed, where possible, to preserve their constitutionality. *Maine Milk Producers, Inc. v. Commissioner of Agriculture, Food and Rural Resources*, 483 A.2d 1213, 1218 (Me. 1984). Any party attacking the constitutionality of a state statute thus carries a heavy burden of persuasion. *Id.* In order to prevail here, Petitioners must prove that no logical construction can be given to the words of the Dirigo Health Act that will make it constitutional.

### 1.    Void for Vagueness

Petitioners assert that the Act is void for vagueness because it provides no standards to guide the Board in its calculation of AMCS. In response, Respondents assert that Petitioners did not preserve the void for vagueness issue because they did not raise it before the Superintendent. Next, Respondents contend that the fact that the standards for calculating AMCS may not be precise does not render the Act vague. See *Maine Milk Producers*, 483 A.2d at 1221 (the mere fact that the Legislature has not spoken "in precise and pellucid language, failure to meet this Olympian standard" does not render it void for vagueness).

"An issue raised for the first time at the appellate stage will be denied cognizance in the appellate review of the case. This rule is controlling even

when, as here, the belatedly raised issues allege constitutional violations."
*Oronoka Restaurant, Inc. v. Maine State Liquor Com.*, 532 A.2d 1043, 1045 (Me. 1987)
(quoting *Maine Real Estate Commission v. Kelby*, 360 A.2d 528, 530 (Me. 1976)).

At hearing before this Court, Petitioners admitted that they did not raise
the void for vagueness argument before the Superintendent. Accordingly, they
are barred from raising it here before the Superior Court.[4]

### 2. Unconstitutional Delegation of the Taxing Powers

Petitioners argue that the savings offset payment calculation in the Act is
an unconstitutional delegation of the taxing powers of the Legislature.[5]

Article IX, section 9 of the Maine Constitution states that "the legislature
shall never, in any manner, suspend or surrender the power of taxation." That
language creates a "strong and sweeping prohibition" against delegation of the
legislature's power to tax. *Maine Milk Producers*, 483 A.2d at 1220. The test for
whether an assessment is a tax rather than a license fee is whether it is primarily
intended to raise revenue rather than to cover costs of administering a program
under the police power of government. *Id*. at 1218; *Board of Overseers of the Bar v.
Lee*, 422 A.2d 998, 1004 (Me. 1980).

In *Maine Milk Producers*, the Law Court found in that payments made into

---

[4]       However, even if this argument were preserved for appeal, the Court finds that the
statute 24-A M.R.S.A. § 6913 is not void for vagueness. The Board was charged with determining
AMCS as a result of the operation of Dirigo Health. Although, the legislative scheme is complex,
a person of general intelligence would understand that a number of factors determine these kind
of savings, such as hospital savings, uninsured savings, health care provider fee savings,
certificate of need and capital investment fund savings, and insurance carrier savings. *See Maine
Milk Producers*, 483 A.2d at 1220 (A statute is void for vagueness only when "it sets guidelines
which would force men of general intelligence to guess at its meaning, leaving them without
assurance that their behavior complies with legal requirements and forcing courts to be uncertain
in their interpretation of the law.").

[5]       In a footnote in its Hearing Brief before the Agency, Petitioners noted a concern that the
savings offset provision may constitute a tax under Article IX of the Maine Constitution. The
Court finds that this was sufficient to preserve the issue.

the Maine Milk Pool to carry out its redistributive function were not taxes, but rather the mechanism for carrying out the legislature's price-fixing power over milk produced in Maine. 483 A.2d at 1218. In the instant case, savings offset payments are the means by which the Legislature redistributes savings in the health care system in order to make health insurance available to a greater percentage of Maine citizens. Similar to the Maine Milk Pool, savings offset payments are the mechanism created to fund the administration of the Dirigo subsidy program. The Act specifically states that savings offset payments may not fund general administration costs.[6] As such, the savings offset payments are appropriately characterized as costs of administering a program under the police power of government, not a tax.

**b.    80C Review of the Superintendent's Decision**

Petitioners' main challenges to the Agency decision are that the methodology adopted by the Board to calculate aggregate measurable cost savings is flawed and the record does not reasonably support the Superintendent's decision.[7]

---

[6]    The Court interprets these general administration costs to be more in the line of photocopying, ordering supplies, mailing correspondence.

[7]    Petitioners also argue that 1) the determination of AMCS is not final agency action and therefore not ripe for review, 2) the Agency failed to provide for a hearing as required under the Act, and 3) the Superintendent erred in denying Petitioners' motion to dismiss based on the Board's failure to submit the Dirigo filing to the Superintendent by September 17, 2005.
    First, this is final agency action. Although Petitioners are not required to contribute to the savings offset payments until that amount is determined by the Board and reviewed by the Superintendent, the determination of AMCS provides the ceiling for the savings offset payment amount and therefore affects the legal rights and duties of Petitioners for which no further recourse is provided within the Agency. *See* 5 M.R.S.A. § 8002(4).
    Second, 24-A M.R.S.A. § 6913(A) provides interested parties with "an opportunity for a hearing" on the issue of AMCS pursuant to 5 M.R.S.A. § 9052(1). For a hearing to occur when a statute provides "an opportunity for a hearing," as opposed to a required hearing, the Agency must provide interested parties with advanced notice to allow the submission of evidence and a request for a hearing if so desired. *Id.* In this case, interested parties were notified that the AMCS issue was before the Board in June 2005. Pursuant to the Act, the Board was charged with calculating AMCS to be filed with the Superintendent by September 17, 2005. Although

7

1.    Standard of Review

In review of an administrative agency decision, the Superior Court, in its intermediate appellate capacity, will uphold the decision unless the agency has abused its discretion, made an error of law, or its findings are not supported by substantial evidence in the record. *Thacker v. Konover Dev. Corp.*, 2003 ME 30, ¶ 14, 818 A.2d 1013 1019. Generally, interpretations of law are reviewed by the Superior Court *de novo*. The Court will examine the plain meaning of the statutory language in order to ascertain the legislative intent. *Botting v. Dep't of Behavioral and Developmental Servs.*, 2003 ME 152, ¶ 9, 838 A.2d 1168, 1171. In doing so, the entire statutory scheme is considered so that a harmonious result may be achieved. However, when a dispute involves an agency's interpretation of a statute it administers, "the agency's interpretation, although not conclusive, is entitled to great deference and will be upheld unless the statute plainly compels a contrary result." *Town of Eagle Lake v. Comm'r, Dept. of Educ.*, 2003 ME 37, ¶8, 818 A.2d 1034, 1037. If the statute is ambiguous the Court reviews whether the agency's construction is reasonable. *Id.* The Court will not "second-guess" an agency on issues within its area of expertise; rather, it reviews only to ascertain whether its conclusions are "unreasonable, unjust, or unlawful." *Id.*

2.    Methodology for Calculating AMCS

---

Petitioners did request a hearing, they did not do so until September 14, 2005. Once notified, the burden shifted to Petitioners to request a hearing. Although technically, Petitioners requested a hearing, the Court finds that Petitioners failed to meet their burden. A request 3 days before the Board was required submit its filing to the Superintendent does not allow ample time for a hearing and the proper adjudication on the matter. Petitioners request for a hearing simply came too late.

Third, the Act required the Board to submit its filing on AMCS on September 17, 2005. September 17, 2005 happened to fall on a Saturday. As such, the Board submitted its filing to the Superintendent the following business day, Monday September 19, 2005. The Court sees no infirmity in this.

The Act authorizes the Board of Directors of the Dirigo Health Agency to determine the methodology for calculating AMCS. The Act does not explicitly define AMCS. It states that the Board shall determine "the aggregate measurable costs savings, including any reduction or avoidance of bad debt and charity care costs to health care providers in this State as a result of the operation of Dirigo Health and any increased MaineCare enrollment due to the expansion of MaineCare eligibility occurring after June 30, 2004." 24-A M.R.S.A. § 6912(1)(A).

Petitioners argue that the Board erred as a matter of law by determining that the calculation of AMCS included anything other than bad debt and charity care costs.[8] A review of the statute and the legislative history does not compel this result. The language of the statute states that AMCS include bad debt and charity care costs. It does not state that bad debt and charity costs are the only costs to be factored into the AMCS determination. Rather, bad debt and charity care costs are separated from AMCS by a comma and the word "including," thus supporting the Board's interpretation that the Legislature contemplated other cost savings to be factored into the AMCS determination.[9]

Since the Court has determined that the Legislature envisioned costs other than bad debt and charity care costs for the determination of AMCS, the next question is whether the five categories of savings initiatives adopted by the Board are unreasonable or are otherwise an abuse of discretion. *See Town of Eagle Lake.*, 2003 ME 37, ¶8, 818 A.2d at 1037. In reviewing the overall scheme of the

---

[8] Although Petitioners argue that the Superintendent erred as a matter of law by refusing to review the methodology adopted by the Board to determine AMCS, it is clear under the Act that he was not authorized to do so. Accordingly, the Court will review the methodology adopted by the Board.

[9] The legislative history, although voluminous, does not clarify this issue to the Court's satisfaction.

Act, the initiatives adopted by the Board are either savings identified in the Act[10] or flow from initiatives included in the Act.[11] Whether or not they are the best initiatives is not for the Court to decide. The Court will not second-guess the Agency on issues within its area of expertise.[12] The initiatives adopted by the Board are reasonable and are not the result of an abuse of discretion.

### 3. A Review of the Superintendent's Decision

After a public hearing, the Superintendent thoroughly analyzed the evidence presented and evaluated whether the AMCS filed by the Board were reasonably supported by the evidence in the record. Of the five savings initiatives proffered by the Board, he found that only three were reasonably supported by the evidence in the record: hospital savings, uninsured savings, and health care provider fee savings. And of those three, he disapproved $41.3 million for hospital savings ($7.6 million for CMAD and $33.7 million for COM), $3 million uninsured savings (the woodworking effect), and $15.8 million for health care provider fee savings ($6.7 million for the time value of early settlement payments by hospitals, $4.1 million for accelerated PIP payments, and $5 million of increased physician payments). In all, the Superintendent found that of the $136.8 million recommended AMCS calculated by the Board, only

---

[10] Components identified in the Act are CMAD, hospital expenses per case mix adjusted discharge; COM, hospital consolidated operating margins; health insurance carrier underwriting gains; and growth in health care practitioner net revenue. P.L. 2003, ch. 469 § F(1)(A)-(C).

[11] Components that flow from the Act are time value of accelerated supplement payments to hospitals; accelerated prospective interim payments (PIP); increased physician payments; and moratorium on certificate of need and limits in spending set capital investment funds.

[12] Although Petitioners are not required to contribute to the savings offset payments until that number is determined by the Board and later the Superintendent, the determination of AMCS is final agency action because the determination of AMCS provides the ceiling for the savings offset payments.

$43.7 million was reasonably supported by the evidence in the record. The Court

finds that the Superintendent's determination is supported by substantial

evidence in the record.

The entry is:

Petitioners 80C appeal is DENIED.
The independent claims are DISMISSED.
24-A M.R.S.A. § 6913 is Constitutional.

DATE: _August 4, 2006_

Roland A. Cole
Justice, Superior Court

11

Date Filed __11/28/05__ CUMBERLAND _____ Docket No. __AP-05-90_____
                              County              (CONS. W/AP-05-95, AP-05-96)

Action __80C APPEAL_____ _

MAINE ASSOCIATION OF HEALTH PLANS          STATE OF MAINE (SUPERINTENDENT, BUREAU
                                           INSURANCE, DEPT. OF PROFESSIONAL &
                                           FINANCIAL REGULATIONS)
                                           DIRIGO HEALTH AGENCY

                                   vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| D. MICHAEL FRINK, ESQ.<br>GEORGE M. LINGE, ESQ.<br>PO BOX 7320<br>PORTLAND, ME 04112-7320<br>774-9000 | William H. Laubenstein, III, AAG (Dirigo)<br>6 State House Station<br>Augusta, ME 04333-0006<br>626-8800 |
| WILLIAM STILES ESQ.<br>(Me. St. Chamber of Commerce) | Thomas Sturtevant Jr AAG (Sup. of Ins)<br>6 State House Station Augusa 04333 |

| Date of Entry | | Defendant's Attorney (cont.) |
|---|---|---|
| | Rufus Brown Esq(Cons. for Afford.<br>PO Box 7530    Health Care)<br>Portland ME 04112 | Joseph P. Ditre Esq. (Cons. for Aff. Heal<br>Bruce Gerrity Esq (MADAIT)<br>Roy Pierce Esq. (MADAIT) |

| Date of Entry | |
|---|---|
| **2005**<br>Nov. 28 | Received on 11/28/05:<br>Plaintiff's Petition for Review of Final Agency Action (Rule 80C) to Superi<br>Court filed. |
| Dec. 7 | Received 12-7-05.<br>Superintendant's motion to consolidate with proposed order filed. |
| Dec. 8 | Received on 12/08/05:<br>Atty. William Laubenstein's Entry of Appearance on behalf of Dirigo Health<br>Agency filed. |
| Dec. 8 | Received 12-8-05.<br>Joint stipulation specifying the future course of proceedings pursuant to<br>M.R.Civ.P. 80C(i) with proposed order filed. |
| Dec. 14 | Received 12-9-05.<br>Order Specifying Future Course of Proceedings filed. (Cole, J.)<br>Pursuant to M.R.Civ.P. 79(a) this order may be incorporated by reference<br>into the docket.<br>12-14-05 copy mailed to D. Michael Frank and William Laubenstein Esqs |
| Dec. 16 | Received 12-16-05.<br>Entry of appearance, statement of position and answer of respondent,<br>Superintendent of Insurance filed. |
| Dec. 19 | Received 12-15-05.<br>The superintendent's motion is granted with the three identified actions<br>consolidated into one proceeding in Superior Court (Cumberland<br>County) Docket AP05-90. (cons. with Kennebec County Superior Court<br>cases AP05-74, AP0-75)<br>12-19-05 copy mailed to D. Michael Frink, William Laubenstein III and<br>Thomas Sturtevant Jr Esqs and to Kennebec County Superior Court. |
| Dec. 19 | Received 12/19/05:<br>Dirigo Health Agency's Answer to Petition for Review filed. |

Date Filed 12/22/05          CUMBERLAND          Docket No. AP-05-95 (CONS. W/AP-05-9(
                                County

Action 80C APPEAL (FROM KENNEBEC COUNTY SUPERIOR COURT; CONSOLIDATED W/AP-05-90)

MAINE AUTOMOBILE DEALERS ASSOC. INS. TRUST          SUPERINTENDENT OF INS.
BANKERS HEALTH TRUST                                DIRIGO HEALTH AGENCY
                                                    ANTHEM HEALTH PLANS OF MAINE (PII)
                                                    MAINE STATE CHAMBER OF COMMERCE (PII)
                                                    MAINE ASSOC. OF HEALTH PLANS (PII)
                                                    CONSUMERS FOR AFFORDABLE HEALTH CARE (]

                                             vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| BRUCE GERRITY, ESQ. (ALL) | JOPSEPH DITRE, ESQ. (CONSUMERS) |
| ROY PIERCE, ESQ. (ALL) | D. MICHAEL FRINK, ESQ. (ME ASSN. HEALTH) |
| | RUFUS BROWN, ESQ. (CONSUMERS) |
| | THOMAS STURTEVANT, AAG (SUPERINTENDENT) |
| | WILLIAM LAUBENSTEIN, AAG (DIRIGO) |
| | WILLIAM STILES, ESQ. (COMMERCE) |
| | CHRISTOPHER ROACH, ESQ. (ANTHEM) |

| Date of Entry | |
|---|---|
| 2005 Dec. 27 | Received on 12/22/05: |
| | All paperwork from Kennebec County Superior Court received (AUGSC-AP-05-74). |
| "        " | Consolidated w/AP-05-90 per order of Justice Cole dated 12/21/05. |
| "        " | All further docketing and filings to be made in AP-05-90 |

Date Filed 12/22/05　　　　CUMBERLAND　　　　Docket No. AP-05-96 (CONS. W/AP-05-90
County

Action 80C APPEAL (FROM KENNEBEC COUNTY SUPERIOR COURT; CONSOLIDATED W/AP-05-90)

MAINE STATE CHAMBER OF COMMERCE

ALESSANDRO A. IUPPA, SUPERINTENDENT
BUREAU OF INSURANCE
DEPARTMENT OF PROFESSIONAL AND FINANC
REGULATION
STATE OF MAINE

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| WILLIAM STILES, ESQ.<br>BRETT WITHAM, ESQ. | JOSEPH DITRE, ESQ. (CONSUMERS)<br>THOMAS STURTEVANT, AAG (SUPERINTENDENT)<br>WILLIAM LAUBENSTEIN, AAG (DIRIGO)<br>BRUCE GERRITY, ESQ. (ME AUTO & BANKERS TR<br>ROY PIERCE, ESQ. (ME AUTO & BANKERS TRUST |

| Date of Entry | |
|---|---|
| 2005<br>Dec. 27 | Received 12/22/05:<br>All paperwork from Kennebec County Superior Court received (AUGSC-AP-05-75).<br>Consolidated w/AP-05-90 per order of Justice Cole 12/21/05. |
| "　　　" | |
| "　　　" | All further docketing and filings to be made in AP-05-90. |